## VICKERS V. WOODRUFF.

Fraudulent Conveyance : CONFLICTING EVIDENCE : QUESTION FOR JURY.  In an action by a son to recover from a sheriff goods seized under execution against his father, on the ground that they had been sold by the father to the son prior to the seizure,—though the father and son both testified to the sale, and to facts which, if true, would show a consideration for the sale, yet the evidence (see opinion) showed other facts which in the nature of things appear inconsistent with the theory of a *bona-fide* transfer of the goods.  *Held* that there was a conflict of the evidence, and that the court erred in directing a verdict for plaintiff.

*Appeal from Mahaska District Court.*—HON. D. RYAN, Judge.

FILED, OCTOBER 10, 1889.

REPLEVIN for a stock of restaurant goods.   From a judgment for the plaintiff the defendant appeals.

*Carroll & Davis* and *Blanchard & Preston*, for appellant.

*Bolton & McCoy*, for appellee.

GRANGER, J.—The stock of goods in question was levied upon as the property of John Vickers, who was a judgment debtor of Hurlburt, Hess & Co.; and at the commencement of this suit the goods were held by the defendant sheriff on execution in favor of Hurlburt, Hess & Co.   Walter Vickers (plaintiff) is a son of John Vickers, and claims the ownership of the goods by purchase from his father.   Some undisputed facts of the case are that John Vickers, from the spring of 1882 to

the fall of 1885 or 1886, kept a small hotel at New Sharon, called the "Pacific House," his son Walter being with him up to the spring of 1885. In the spring of 1885, Walter left, and was absent about eighteen months, and then returned. At this time the only property owned by John Vickers was a piece of land in Kansas, and a vacant lot in New Sharon. Afterwards the land in Kansas was traded for a stock of restaurant goods, which, with additions and reductions in the course of trade, is the stock in suit. After the purchase of the stock, a building was erected on the vacant lot, and the stock placed therein. John Vickers and his family, including plaintiff, lived in the building, a part of which was used as a restaurant. In January, 1887, the stock of goods was sold to plaintiff, as claimed by him, for a consideration of six hundred dollars, with a payment down of three hundred dollars, which was due plaintiff from his father for his work while in the Pacific House before he left in the spring of 1885. Prior to the transfer of the stock to the plaintiff, John Vickers transferred the restaurant lot and building to another son; the two sales including all his property. This much is stated merely to show the general character of the transaction which the defendant claims is fraudulent as to creditors. At the time of the transfer of property, John Vickers was a debtor to Hurlburt, Hess & Co., being a surety on notes afterwards placed in judgment. At the close of the testimony, on motion of the plaintiff, the court directed a verdict in his favor, and it is of this ruling of the court that the defendant complains. The action of the court in thus taking the case from the jury cannot be sustained. Without relying on the rule that where there is any conflict in the evidence the cause must be submitted, we may say that a majority of this court are of the opinion that if there had been a verdict for defendant a refusal to set it aside would not have been reversible error. It is not necessary to set out the testimony in detail to manifest the reasons for our conclusions; hence a brief statement will suffice: When John Vickers opened the Pacific House, Walter was

under age. At the time of the trial,—October, 1888,— he was between twenty-seven and twenty-eight years old. The three hundred dollars which was the first payment on the stock was claimed to be due Walter for work in the hotel. The testimony as to what Walter did in and about the hotel varies materially. Walter and his father say he was to have one hundred and fifty dollars per year, and that he worked under that agreement three years ; and Walter says he received from time to time one hundred and fifty dollars before leaving for the West, leaving a balance his due of three hundred dollars. The hotel was a very small one, and at best the patronage must have been light. Up to the time of going West, Walter had always lived at home in the family, and as a member of the family. Barring the testimony of Walter and his father as to the employment, and the evidence as to the service he rendered, the surrounding circumstances are as consistent with the idea of his being there merely because it was his home as in any other capacity. At the time of leaving home, if his story and that of his father is correct, his father was owing him three hundred dollars. By Walter's own statement he left home with little more, if any more, money than five dollars which he obtained from one Calbach for services in sleeping in and sweeping the bank, and doing other chores. He did not ask for, nor did his father offer him, money for his trip ; nor was anything said in regard to it,—nothing whatever said as to the payment. It is not disputed but that the business between John and Walter was conducted loosely, and the excuse or explanation is that it was a "family affair, and naturally would be so." When Walter returned from the West in the fall of 1886, he again lived with his father in a private house till the restaurant was built, and was sick and unable to work. Before the transfer of the stock to Walter the building was sold to a son, Antrim, and the testimony is not very satisfactory as to the consideration therefor, but a part at least of that was for work done by Antrim. After the transfer of the stock the father and his family continued in the

Vickers v. Woodruff.

restaurant as before, except, perhaps, as to the manage-
ment and work, that being done by Walter, with some
help from members of the family. It may also be said
that when the sale was made of the stock there was no
definite agreement as to the payment of the remaining
three hundred dollars. The restaurant building trans-
ferred to Antrim was soon after transferred by Antrim
to John Vickers' wife. Many other material facts
might be stated, but it is unnecessary. These facts are
sufficient to show that a conclusion as to the fraud must
be reached by the consideration of testimony that is con-
flicting, and to such a degree as to entitle the parties to
its consideration by a jury. If the testimony of Walter
and John Vickers is to be taken as true, of course it
settles the question; but it must be kept in mind that
they are charged with the fraud, and their statements
are to be taken and weighed with the surrounding cir-
cumstances; and wherein their own conduct is not con-
sistent with their claims it furnishes evidence tending to
contradict their statements. It should not be under-
stood that there is not much evidence in the record tend-
ing to overcome any inference that may be drawn from
the facts narrated, as well as others tending to strengthen
them, and we are by no means intimating that such
other evidence may not be abundantly sufficient to
justify a verdict for the plaintiff, nor do we mean to
intimate that it would, our only purpose being to show
that the question of fraud is one for the jury. The
judgment of the district court must be and is

REVERSED.